UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

     v.

STEVE S. JABAR and DEBORAH
BOWERS,

           Defendants.
_____

09-CR-170
DECISION AND ORDER

On September 2, 2016, after a five-week jury trial, defendants Steve S. Jabar

and Deborah Bowers were convicted of conspiring to commit wire fraud, engaging in

wire fraud, and making several materially false statements.

The defendants now (1) renew their motion pursuant to Federal Rule of Criminal

Procedure 29 for a judgment of acquittal, on which this Court previously reserved

decision; and (2) move for a new trial pursuant to Rule 33.  Docket Items 398, 399, 433.

For the following reasons, the defendants' Rule 29 motions are granted with respect to

Counts 1 and 4 (wire fraud conspiracy and wire fraud) but are denied with respect to all

other counts, and their Rule 33 motions are denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The defendants were convicted of crimes related to their involvement in a not-for-

profit corporation known as Opportunities for Kids International ("OKI").  Jabar served

as a member of OKI's Board of Trustees and was in charge of OKI in Baghdad, Iraq.

Bowers served as OKI's Executive Director, and she maintained signatory authority over

OKI bank accounts and conducted the corporation's day-to-day financial affairs.

In 2004, the defendants, on behalf of OKI, applied for a grant from the United Nations Development Fund for Women ("UNIFEM"), an entity of the United Nations ("UN"), to establish a radio station in Iraq. Known as Radio Almahaba or Voice of Women Radio, the radio station had the mission of empowering Iraqi women as part of the effort to make Iraq stable and democratic. The application was approved, and in December 2004, UNIFEM and OKI signed an institutional contract providing a grant in the amount of $500,000 and a standard cooperation agreement. Jabar signed on OKI's behalf, and upon his signature OKI received the first installment of the grant in the amount of $350,000. Because the required quarterly financial report was submitted late with inadequate tracking and proof of expenditures, however, OKI never received the $150,000 balance.

In June 2005, three financial institutions advised the Internal Revenue Service ("IRS") that OKI had attempted to wire several hundred thousand dollars to the Middle East. During the course of the investigation that followed, and because of wire transfers related to the UNIFEM grant, IRS Special Agent Michael Klimczak interviewed Bowers and Jabar in July and September 2006, respectively, about OKI's financial records and expenditures.

In May 2009, the defendants were indicted on various counts of conspiring to commit wire fraud, engaging in wire fraud, laundering money, and making materially false statements. Docket Item 1. The indictment alleges that the defendants engaged in a scheme to divert to themselves some of the grant money OKI received from UNIFEM and to use that money to pay personal debts and expenses instead of to establish the radio station. *Id.*

For a number of reasons—especially the parties' affinity for motion practice—the case languished in pre-trial purgatory for years. The case was reassigned from the Honorable Richard J. Arcara to the undersigned on November 12, 2015, and the defendants' joint trial began on August 2, 2016. On August 19, 2016, at the close of the government's case, the defendants moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Docket Item 398. After hearing oral argument on the motion, this Court reserved decision. *Id.*

On September 2, 2016, the jury returned its verdict. Specifically, Jabar was convicted on Counts 1, 4, and 14: one count of wire fraud conspiracy, 18 U.S.C. Sections 371, 1343; one count of wire fraud, 18 U.S.C. Sections 2, 1343; and one count of making materially false statements, 18 U.S.C. Section 1001(a)(2). Docket Item 420. Bowers was convicted on Counts 1, 4, 11, 12, and 13: one count of wire fraud conspiracy, 18 U.S.C. Sections 371, 1343; one count of wire fraud, 18 U.S.C. Sections 2, 1343; and three counts of making materially false statements, 18 U.S.C. Section 1001(a)(2). *Id.* Both defendants were acquitted on Counts 2 and 3 (wire fraud), and on Counts 5, 6, 7, 8, and 9 (money laundering). *Id.* Bowers also was acquitted on Count 10 (materially false statements). *Id.*

The defendants moved for a judgment of acquittal or a new trial on October 29, 2016. Docket Items 433-34. The government responded on December 16, 2016, Docket Item 442, and the defendants replied on January 9, 2017, Docket Item 446. On February 9, 2017, this Court heard oral argument, reserved decision, and requested further briefing from both sides. Docket Item 458. The additional briefing and replies,

which this Court has considered along with the initial briefing in rendering this decision, were submitted on February 24 and March 10, 2017. Docket Items 463-64, 466-67.

## DISCUSSION

### I.    Legal Standards

### A.    Motion for a Judgment of Acquittal (Rule 29)

A district court shall enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. At the same time, the court must "avoid usurping the role of the jury." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003). So "'[a] defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden' . . . [and courts] must uphold the judgment of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Vilar*, 729 F.3d 62, 91 (2d Cir. 2013) (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) and *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (alteration omitted).

The Second Circuit has phrased it this way: "[A] court may enter a judgment of acquittal if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quotations omitted). But in a close call, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Id.* at 129.

In considering whether the evidence is sufficient to support a guilty verdict, "[a] court examines each piece of evidence and considers its probative value before determining whether it is unreasonable to find the evidence in its totality, not in isolation,

sufficient to support guilt beyond a reasonable doubt." *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (internal quotations omitted). Courts "resolve all inferences from the evidence and issues of credibility in favor of the verdict." *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000). When the evidence, viewed in favor of the prosecution, "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence[,]" however, "a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quotation and citation omitted).

### B.    Motion for a New Trial (Rule 33)

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A district court should grant a new trial motion if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (quotation omitted). When considering a motion for a new trial, a district judge "is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *Id.* (quotation omitted); *see also United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992) (stating that a court also may make determinations as to witness credibility). But while courts have greater deference under Rule 33 than Rule 29, they still must exercise their authority pursuant to Rule 33 "sparingly" and only in "the most extraordinary of circumstances[;]" in other words, there must be a real concern that an innocent person may have been convicted. *Sanchez*, 969 F.2d at 1414.

## II.    Count 4 (Wire Fraud)

Jabar and Bowers challenge their convictions for wire fraud under 18 U.S.C. Section 1343.[1]  The foundation for the wire fraud charge was their receipt of the UNIFEM grant.  Jabar and Bowers were charged with using wire communication in foreign or interstate commerce to fraudulently represent that the grant money would be acquired and used by OKI to establish and run a radio station.  Docket Item 1 at 6.  The statute prohibits using wire communication in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.

To convict a defendant of wire fraud, the government must prove the following essential elements:  "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."  *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (internal quotations omitted).[2]  To prove such a scheme, the government must produce "proof of a scheme or artifice to defraud, which itself demands a showing that the defendants possessed a fraudulent intent."  *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (internal quotation marks omitted).  Fraudulent

_____

[1] The defendants challenge their convictions on both wire fraud conspiracy and wire fraud.  Because the underlying elements of wire fraud are the same for both crimes, the Court addresses the defendants' substantive wire fraud convictions before turning to their respective wire fraud conspiracy convictions.

[2] Because the wire fraud and mail fraud statutes use the same relevant language, the case law involving either crime is informative on the other.  *See Binday*, 804 F.3d at 569; *see also Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here.").

intent necessarily includes an intent to cause some kind of actual harm. *Starr*, 816 F.2d at 98. The scheme need not have been successful—the victims of the fraud need not have been actually harmed—but the government still must show "that some actual harm or injury was *contemplated* by the schemer." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (citation omitted).

> Intent to deceive is not enough. As the Second Circuit has noted:

> Because the defendant must intend to harm the fraud's victims, "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *Starr,* 816 F.2d at 98. "Instead, the deceit must be coupled with a contemplated harm to the victim." *Id.* In many cases, this requirement poses no additional obstacle for the government. When the "necessary result" of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself. . . . Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent.

*Id.* So when fraudulent intent cannot be inferred from the scheme itself, "[o]nly a showing of intended harm will satisfy the element of fraudulent intent." *Starr*, 816 F.2d at 98.

## A.    Intent to Defraud

In an effort to prove some contemplated harm or injury to the UN, the government points to the defendants' use of the UN grant funds for purely personal purposes soon after they were deposited into the OKI account. The government contends that the immediate use of the UN funds to repay personal loans that Jabar had received from Bassam Bitar and Saad Almizoori—totaling $30,000—together with the defendants' failure to disclose their connection with UN employee Bushra Jamil is sufficient to prove a scheme to defraud the UN. But while that evidence may well be

sufficient to show intent to deceive, it does not evidence the required intent to harm. And for that reason, the defendants' convictions under Count 4 must be set aside.

The analysis begins with the Second Circuit's reversal of the mail and wire fraud convictions in *Starr*. In that case, the defendants were convicted of mail and wire fraud for engaging in a scheme to defraud their customers by burying higher rate mailings in lower rate bulk mailings without paying the additional postage or refunding their customers' excess postage payments. 816 F.2d at 95. On appeal, the defendants argued that the evidence was insufficient to show that they had the requisite intent to defraud their customers. *Id.* at 97. The Second Circuit agreed. It explained the relationship between and among misrepresentations, intent, and harm in the fraud context:

> Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.

816 F.2d at 98 (quotation omitted).

The Second Circuit disagreed with the government's argument that the misappropriation of the funds itself demonstrated that the defendants had contemplated harm to their customers. *Starr*, 816 F.2d at 99. In the words of the court, "[a]lthough it may be assumed that the use to which the money would be put, and the concomitant expectation that it would be used for a specific purpose, implicitly constituted a part of the bargain between the parties, that defeated expectation alone would not affect the nature or quality of the services that was the basis of the customers' bargain." *Id.* at 99-

100.  Because the misappropriation of funds was not central to the contract between the defendants and their customers, and because the government had not otherwise shown how the misappropriation demonstrated that the defendants intended to harm their customers, any alleged harm was at most "metaphysical" and not enough from which to infer fraudulent intent.  *Id.* at 100.  Stated another way, the customers got what they paid for, and the defendants' fraud in avoiding the required postage payments did not change that.

After *Starr*, the cases in the Second Circuit "have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not necessarily violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes."  *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007).  "An intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed."  *Novak*, 443 F.3d at 159.  If a party receives what it bargains for and the defendant's conduct does not affect an essential element of that bargain, then "the evidence is insufficient to show the requisite intent to harm."  *Id.*

Because the government offered no proof that the defendants did not intend to build the radio station the UN had bargained for—or even that the defendants did not intend to spend the equivalent of the UN grant in fungible dollars on the radio station— the government proved only intent to deceive, not intent to defraud.  For example, the government maintains that it proved the defendants' fraudulent intent through evidence

of: (1) Bowers's and Jabar's undisclosed relationship with the UN's Bushra Jamil; (2) the defendants' embellishing the qualifications of the OKI board members; (3) Jabar's mounting debts that the UN funds were used to pay; (4) the defendants' breach of contractual promises in the UNIFEM Agreement as to how the expenditures would be approved, spent, and recorded; (5) the inaccuracies in the quarterly report submitted by the defendants; (6) the mislabeling of checks that went to personal expenditures (including a $7,219 check that was used to pay for Jabar's property taxes); and (7) the increase in the proposed budget from $423,000 to $500,000. Docket Item 470 at 108-28. That evidence, when viewed in light of the purpose of the UNIFEM Agreement, indeed suggests deceit and shady bookkeeping. But it does not prove intent to harm the UN—especially when the defendants built, and the UN got, the radio station that the UN bargained for.

Because money is fungible, this is not a case where the necessary result of the defendants' alleged scheme was injury to others. *See D'Amato*, 39 F.3d at 1257. If the defendants used *some* money to build a radio station—as they in fact did here—their spending on themselves dollars from a UN grant earmarked for the radio station did not *necessarily* defraud the UN. As a result, the government was required to produce evidence independent of the alleged scheme to defraud to prove the defendants' fraudulent intent. *See D'Amato*, 39 F.3d at 1257 ("Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent."). So to prove the fraudulent intent of Bowers and Jabar, the government was required to show that each of them made misrepresentations or omissions intended to

harm the UN in a way that affected the nature of the bargain—i.e., the UNIFEM

Agreement.  *See Starr*, 816 F.2d at 98-99.

But the circumstantial evidence and omissions offered by the government fell

short.  The nature of the bargain at issue here was simple and straightforward:  Under

the UNIFEM Agreement, UNIFEM agreed to give the defendants a grant of $500,000—

and actually gave them the first $350,000—toward building a radio station.[3]  UNIFEM

reasonably anticipated that $350,000 worth of a radio station would be built after the

defendants spent the first installment of the grant money.  If the government had shown

that at the time they signed the UNIFEM Agreement, the defendants never intended to

build $350,000 worth of a radio station, then it would have proven that the defendants

possessed the requisite fraudulent intent.  *See Starr*, 816 F.2d at 98 ("Such harm is

apparent where there exists a discrepancy between benefits reasonably anticipated

because of the misleading representations and the actual benefits which the defendant

delivered, or intended to deliver.") (citation and internal quotation marks omitted).  But

the government did not even try to prove that.

As the testimony of the government's accountant revealed, the government did

not even look into the expenditures by the defendants of money other than the UNIFEM

---

[3] The contract itself, signed by Jabar, provided for the "[e]stablishment of Voice of Women independent radio station as part of IRAQIA project . . ." and made "fees payable in installments upon certification of satisfactory performance at each phae [sic]"—$350,000 "[u]pon signing the contract" and $150,000 "[u]pon radio station equipment arrival to Baghdad."  Gov't Exhibit 207C.  Jabar also signed a page referencing the "duration and terms of payment" that stated:  "For the radio station establishment, UNIFEM will pay OKI the amount of *Five Hundred Thousand US Dollars (US$500,000)* where *Three Hundred and Fifty Thousand US Dollars (US$350,000.-)* will be paid upon signing the contract and *One Hundreds [sic] and Fifty Thousand US Dollars (US$150,000.-)* will be paid on a quarterly, three-months, basis based on the Standard Project Cooperation Agreement."  Gov't Exhibit 12N.

grant money.  *See generally* Docket Item 418; Gov't Exhibits 40A-H, 40K, 40M-O.  In fact, only the defense presented the jury with evidence showing the money spent on the radio station.  More specifically, the defense offered evidence of receipts from radio station expenditures totaling $362,918 at the end of the first quarter.  Def. Exhibits 11, 11A, 11E, 12A-B, 12D-F, 12I-J, 12M-N, 12S-Y, 13, 13A-I, 13K-P, 37A.  And the defense also submitted an annual financial report showing that more than $350,000 went to the radio station by the end of 2005.[4]  Def. Exhibit 46A at 5.

The government apparently believed that simply proving that the defendants received money from the UN and then immediately spent that money on personal expenses was enough to prove the requisite intent to defraud.  That belief was misplaced.  The government's proof may have been sufficient to show that the defendants intended to use UN money dollar-for-dollar not on the radio station but on personal expenses.  But that is not the same as intending to harm the UN by not giving the UN the benefit of its bargain—and not intending to use, and actually using, other fungible dollars to build the radio station for which the UN money was given.  *See Starr*, 816 F.2d at 98-99.

In fact, the government never even proved that the defendants agreed to spend the grant money—dollar-for-dollar—on the radio station and not to commingle the UN dollars with other money.  Had the government proved that the defendants were

---

[4] The Court takes judicial notice under Federal Rule of Evidence 201(c)(1) that the U.S. Department of the Treasury reported the exchange rate at the end of each fiscal quarter of 2005 as about .00068 USD per 1 Dinar.  *See* Treasury Reporting Rates of Exchange, https://www.fiscal.treasury.gov/fsreports/rpt/treasRptRateExch/ historicalRates.htm.  The Court used the 534,603,679 Dinar figure listed as "Transfers revenues (donation received)" in Exhibit 46A to make its calculation.  *See* Def. Exhibit 46A at 5.

required, as part of the OKI–UNIFEM Agreement, to spend the grant money dollar-for-dollar on the radio station, then the jury might have had at least some basis to conclude that the UN did not get what it bargained for.  But the government told the Court that there was no such requirement.  Docket Item 470 at 104 ("THE COURT:  . . . You don't have any document that says the money can't be commingled, that it's got to be spent dollar for dollar?  MS. GRISANTI:  Correct.").  And because there was no requirement to spend the allocated funds—dollar-for-dollar—on the radio station, the fungibility of money exposes the flaw in the government's argument that "you can't take UNIFEM money and spend it any way you want."   Docket Item 415 at 50.

Moreover, even if the defendants had promised, pursuant to Article VIII, Paragraph 2, and other provisions of the UNIFEM Agreement, not to spend the grant money dollar-for-dollar the way that they did, the simple fact of their breach alone—even if an intentional breach—does not prove fraud.  *U.S. ex rel. O'Donnell v. Countrywide Homes Loans, Inc.*, 822 F.3d 650, 660 (2d Cir. 2016) ("[B]reach of a contract, without further evidence of fraudulent intent, does not establish a fraud claim.") (citation omitted).  So while the government may have shown that the defendants intended to use dollars from the UN grant to pay personal expenses, that is insufficient to prove an intent to harm the UN.  Nor did the government demonstrate that the defendants did not intend to (or even did not actually) purchase the components of the radio station from UN money and other money that totaled $350,000 or more.[5]  And because the initial $350,000 installment was conditioned only upon the defendants'

---

[5] *See* Def. Exhibits 14-16, 19-20, 24, 27, 28, 31, 33-34 (photographs of the radio station, up and running).

signature—not upon an audit confirming that the quarterly financial report matched up with the finalized budget—any failure by the defendants to adhere to obligations under Article VIII, Paragraph 2, and accurately complete the quarterly report did not affect the nature of the UNIFEM Agreement. *See Starr*, 816 F.2d at 98-99; Gov't Exhibit 207C; Docket Item 427 at 96-97.

And all that is supported by the defendants' view of their use of the money, as evidenced by their admissions to Agent Klimczak, the IRS agent who interviewed both Jabar and Bowers in 2006 about their use of the UN grant money. According to Klimczak, when Jabar was confronted with paperwork showing that Bowers had wired $4,200 of UNIFEM grant money into his personal bank account, Jabar "basically said . . . that this is life, *you borrow money, and you pay it back*. I needed the money. I didn't care where it came from. I needed to pay Bitar, bills, loans." Docket Item 426 at 82 (emphasis added). As for Bowers, the testimony showed that she regarded the personal uses of the grant funds as loans. *See, e.g.*, *id.* at 160 ("[S]he did mention to me that yes, she should have listed the $30,000 as a loan for Steve Jabar."). And using loans to fund the radio station was nothing new and not limited to UN funds; on the contrary, it was the defendants' regular course of business. Bushra Jamil testified that she, her brother, her uncle, and others, including Nesrin Dickow and Hana Korkis, had loaned Jabar money for the radio station. Docket Item 429 at 5, 8, 12-13, 18, 26, 140, 172, 175-76.

In other words, the defendants intended to build—and indeed built—a radio station using UN money and other dollars. They also intended to use UN grant money and other dollars to pay back Jabar's personal debts. And they saw the UN money and

the other dollars—like the payment of debt and expenditures for the radio station—as part of a single pot.  That may have been a breach of contract.  It appears to be evidence of an intent to deceive.  It undoubtedly was not good accounting.  But it is not proof of criminal intent to defraud.

### B.    Government's Intent to Harm Argument

Perhaps sensing that its proof at trial had failed to show that the defendants intended to harm the UN, the government argued that it did not need to do so.  During oral argument of the Rule 29 motion, the Court asked the government what evidence it had presented of the defendants' intent to harm the UN:

> THE COURT:  Okay.  Let me ask the government:  What do you have on intent other than financial difficulty and the fact that the money didn't go directly to the radio station?

Docket Item 441 at 45.  The government's response tried to distinguish intent to defraud from intent to harm:

> MS. KRESSE:  Well, Judge, the government does not have to prove intent to harm the U.N.  The government has to prove intent to defraud the U.N. or to obtain money by materially false and fraudulent pretenses and representations.

*Id.*  But the government's response seems to conflate intent to deceive and intent to defraud.  Because there can be no intent to defraud without intent to harm, *see Starr*, 816 F.2d at 98, the government's bootstrapping provides no foothold for its fraud case.

The government doubled down on this precarious position to the very end.  In its post-conviction briefing, the government actually admitted its failure to adduce evidence of the defendants' intent to harm the UN.  In its own words, "the government cannot be faulted for failing to present evidence of the other 'types' of intent the defendants claim are legally required—intent to deceive, *intent to cause economic harm to the victim, and*

*intent to unlawfully obtain property of another.*" Docket Item 442 at 18 (emphasis added) (internal quotation marks omitted). Faulted or not, the government was (and is) incorrect to argue that intent to defraud does not require an intent to harm the victim.

The government also argued that this Court refused to charge the jury on such a requirement. *Id.*[6] But this Court explicitly told the jury that the government was required to prove "that the defendants knowingly devised the scheme to defraud with the specific intent to defraud," and then explained that "'intent to defraud' means to act consciously and with the specific intent to deceive[,] *for the purpose of causing some financial or property loss to another person or entity*, as well as to realize some personal gain." Docket Item 437 at 43 (emphasis added). Although the Court's instructions did not use the words "intend to harm," the substance of this instruction is that a defendant must have engaged in a scheme "for the purpose of causing"—i.e., intended to cause—some sort of loss—i.e., harm—to a victim. It therefore is not surprising that at the post-conviction hearing, defense counsel acknowledged that the Court "absolutely" had instructed the jury on the requisite intent to harm. *See* Docket Item 470 at 43.

## C.    Right to Control

Having rejected the government's theory under *Starr*, this Court turns to the government's alternate theory—presented after trial—that "the UN would not have given the grant money to OKI had it known that the defendants intended to use any part of

---

[6] The government is correct when it says that this Court charged the jury that "the government need not prove that the defendants actually realized any gain from the scheme to defraud or that the intended victim actually suffered any loss." Docket Item 442 at 18-19. But the instruction that no actual loss was required for conviction is very different from the government's argument here—that it did not need to prove that the defendants intended to harm the UN.

those funds for their own personal use."  Docket Item 442 at 14.  Citing the Supreme

Court's recent decision in *Shaw v. United States*, 137 S. Ct. 462 (2016), the government

notes that a party can be harmed, even if it gets what it bargained for, if it parts with its

money as a result of deceit.  *Id.* at 19.  Called the "right to control" theory in the Second

Circuit, this concept has evolved ever since Judge Learned Hand observed that:

> A man is none the less cheated out of his property, when he is induced to
> part with it by fraud, because he gets a quid pro quo of equal value.  It may
> be impossible to measure his loss by the gross scales available to a court,
> but he has suffered a wrong; he has lost the chance to bargain with the facts
> before him.  That is the evil against which the [mail fraud] statute is directed.

*United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932).[7]

Today in the Second Circuit, when the government pursues the "right to control"

theory by seeking to show that a person or entity lost its chance to bargain intelligently

because of some deceit or non-disclosure, it must prove that the person or entity "has

been deprived of potentially valuable economic information."  *United States v. Dinome*,

86 F.3d 277, 283 (2d Cir. 1996) (citation omitted).  "[T]he information withheld either

must be of some independent value or must bear on the ultimate value of the

transaction."  *Id.* (citation omitted).  In other words, "misrepresentations or non-

disclosure of information cannot support a conviction under the 'right to control' theory

unless those misrepresentations or non-disclosures can or do result in tangible

economic harm."  *United States v. Finazzo*, 850 F.3d 94, 111 (2d Cir. 2017).  For two

reasons, the government's "right to control" argument is misplaced.

---

[7] Since defining "fraudulent intent" as requiring a contemplated harm to the victim
in *United States v. Regent Office Supply*, 421 F.2d 1174 (2d. Cir. 1970), the Second
Circuit recognized "there can be no doubt that *Rowe* has been deprived of much of its
vitality."  *Starr*, 816 F.2d at 101.

First, the government did not pursue such a theory at trial, the government did not request a jury charge on this theory, and this Court therefore did not charge the jury on this theory. *Compare* Docket Item 437 (jury charge) *with Finazzo*, 850 F.3d at 111-12 (finding "[t]he district court informed the jury that the 'right to control' one's assets is injured 'when a victim is deprived of potentially valuable economic information it would consider valuable in deciding how to use its assets.'"). So the government has waived any argument that the UN was a victim of fraud because it was deceived into parting with its money through misrepresentations or non-disclosures.

Second, even if the government had proceeded under such a theory, and even if the jury had been so charged, the government—through its own admissions—would not have shown that the defendants' "misrepresentations or non-disclosures [could] or [did] result in tangible economic harm" to the UN. *See Finazzo*, 850 F.3d at 111.

In *Finazzo*, the Second Circuit upheld mail and wire fraud convictions for a defendant who used his position at the company that employed him to hire a vendor that he failed to tell the company he had an ownership interest in. *Id.* at 98-99, 102, 114-15. The vendor had charged higher prices for an inferior product, and the government proved that the company lost money because the defendant's inside dealing prevented the company from bargaining intelligently. *Id.* at 114. Further, the government established ways that the company was harmed, such as the defendant's refusal to shift 25% of the vendor business overseas, which would have saved the company millions of dollars. *Id.* at 114. Because the government proved that the defendant used his position to steer a significant amount of business to the vendor in a

manner that inflicted tangible economic harm on the company, the defendant's deceit crossed the mail-and-wire-fraud line under the "right to control" theory. *Id.* at 113-14.

Here, the evidence that the government argues supports its "right to control" theory—e.g., the failure to tell the UN about Jabar's financial troubles, his friendship with Bushra Jamil, and the comingling of UN grant money with money used to pay personal expenditures—did not and could not result in tangible economic harm to the UN.[8] There was no evidence presented at trial that the defendants' non-disclosures prevented the UN from negotiating a better bargain on a radio station. *Cf. id.* at 113-14. Nor did the non-disclosures lead to tangible economic harm to the UN, as it ended up with what it bargained for—an Iraqi radio station. *Cf. id.* Indeed, the government has conceded that it did not believe it had to show that the defendants intended the UN to suffer *economic* harm. *See* Docket Item 442 at 18 ("[T]here was no requirement that the government prove that the defendants intended economic harm to the UN.").[9]

The government's reliance on *Shaw* does not save it, either. In *Shaw*, the defendant used the identifying numbers of a Bank of America customer's account to transfer funds from that account to accounts in other banks to which the defendant had

---

[8] With regard to "right to control" cases, the Southern District of New York held recently that the Second Circuit upholds convictions "where the deceit had the potential to cause economic harm to the victim *or where it involved a violation of the law.*" *United States v. Davis*, 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) (emphasis added). The non-disclosures set forth by the government—Jabar's financial troubles, his friendship with Bushra Jamil, and the defendants' intent to comingle the UN grant money with money for personal expenditures—did not inherently involve a violation of the law and therefore such a theory here, even if it had been presented and charged, would fail.

[9] The government is correct that intent to cause economic harm is not always required in a fraud case. *See, e.g.*, *Shaw*, 137 S. Ct. 462. But such intent is required when the government pursues a "right to control" theory. *See Finazzo*, 850 F.3d at 111.

access. *Id.* at 466. The defendant claimed that he did not intend to cheat the bank; rather, he intended only to defraud the customer. *Id.* The Supreme Court disagreed. *Id.* Both the bank and the customer had property rights in the customer's account. *Id.* The Court noted that the federal bank fraud statute, 18 U.S.C. Section 1344, "while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Id.* at 467. Because the defendant intended to deprive the bank of the right to use the money entrusted to it by its customer, the fact that the defendant may not have intended the bank to suffer financial harm was irrelevant. *Id.*

Shaw is factually a very different situation and is distinguishable for that reason alone. Moreover, because *Finazzo* was decided after *Shaw*, the Second Circuit's "right to control" jurisprudence survives the Supreme Court's decision. Because the "misrepresentation or non-disclosure of information" here could not and did not "result in tangible economic harm," the "right to control" theory would not salvage the defendants' convictions even if the government had pursued it at trial.[10] *See Finazzo*, 850 F.3d at 111.

---

[10] The defendants have argued that their good faith also undermines their wire fraud convictions. *See* Docket Item 464 at 6-7. Having concluded that the defendants lacked the required intent to defraud, this Court need not and does not address "good faith" here. Suffice it to say that it would be logically inconsistent for the defendants to have had good faith and still be convicted for wire fraud. *See* Samuel W. Buell, *Good Faith and Law Evasion*, 58 UCLA L. Rev. 611, 639, 639 n.105 (2011) (noting "federal courts have repeated innumerable times the black-letter principle that a defendant's good faith negates the specific intent to defraud" and citing cases as examples).

### III.    Count 1 (Wire Fraud Conspiracy)

Both defendants also were convicted on one count of conspiracy to commit wire fraud in violation of 18 U.S.C. Section 371.  To be convicted under Section 371, two or more persons must have "conspire[d] either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose," and one or more of such persons must have taken an overt act to effect the object of the conspiracy.

The defendants' convictions for wire fraud conspiracy required proof that they conspired to commit the substantive offense.  As addressed above, the government failed to prove that the defendants had the requisite intent for the substantive offense of wire fraud, and so no agreement between them could have established a conspiracy to commit wire fraud.  *See United States v. Feola*, 420 U.S. 671, 686 (1975) ("[I]n order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself."); *see also United States v. Cangiano*, 491 F.2d 906, 909 (2d Cir. 1974) ("Where the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute.").  Therefore, the defendants' convictions on Count 1 are set aside as well.

### IV.    Materially False Statements (Counts 11, 12, 13 for Bowers; Count 14 for Jabar)

Bowers was convicted on three counts, and Jabar on one count, of making materially false statements to federal agents.  The defendants' convictions for false statements do not parallel their wire fraud and wire fraud conspiracy convictions

because a defendant can be convicted for making materially false statements even without the specific intent to defraud. *See United States v. Yermian*, 468 U.S. 63, 73 n.12 (1984) ("Intent to deceive and intent to defraud are not synonymous. Deceive is to cause to believe the false or to mislead. Defraud is to deprive of some right, interest or property by deceit") (citation omitted). In fact, while the proof at trial was insufficient to sustain the defendants' fraud and conspiracy convictions, *see supra* Parts II and III, that proof nevertheless showed that the defendants knew they were doing something wrong by deceiving the UN and tried to hide it. And so even though the deceitful intent and conduct of the defendants were insufficient to establish fraud, the attempt to cover up that conduct might still be criminal.

"It is a federal crime under 18 U.S.C. § 1001 to make any false or fraudulent statement in any matter within the jurisdiction of a federal agency." *Yermian*, 468 U.S. at 64. "[I]n order to secure a conviction under § 1001(a)(2), the Government must prove that a defendant (1) knowingly and willfully, (2) made a materially false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent." *United States v. Coplan*, 703 F.3d 46, 78 (2d Cir. 2012) (emphasis omitted).[11]

On Count 11, Bowers was convicted of falsely stating that a $7,219 check went to the radio station, when it really went into Jabar's personal bank account and then was

---

[11] For purposes of clarity and at the request of both parties, Docket Items 274 at 46; 353 at 110, this Court explained materiality as an element separate from the false statement itself and thus discussed the criminal offense under Section 1001 as requiring proof of five essential elements.

spent on property taxes. *See* Docket Item 420 at 12. Klimczak testified that when questioned about the check, Bowers said that she used the money for the radio station and that "she [knew] that because VOW Radio is listed in the memo section of the check." Docket Item 426 at 63; *see* Gov't Exhibits 15G, 21B. But when Klimczak confronted Bowers with a corresponding check in the identical amount that went to pay Jabar's taxes, she admitted that she actually had used that money to pay the taxes at Jabar's request. *Id.* at 230-31.

On Count 12, Bowers was convicted of telling Klimczak that a $10,000 wire transfer from OKI's Key Bank account to Jabar's M&T bank account eventually was wired to Amman, Jordan, when it actually was used to pay Jabar's personal loan. *See* Docket Item 420 at 13. According to Klimczak, when questioned about this transfer, Bowers stated that she had used the wire transfer as an efficient way to send the grant money overseas. Docket Item 426 at 232. But when shown evidence of the payment on Jabar's personal loan, Bowers admitted where the money actually went. *Id.* at 232-33.

On Count 13, Bowers was convicted of saying that a $4,200 wire transfer was made from her personal account into Jabar's personal account to facilitate transferring funds to Iraq, when the money actually went toward paying Jabar's personal expenses. *See* Docket Item 420 at 14. Klimczak testified that when he asked Bowers about this transfer, she said "that she was having trouble transferring the money over to the radio station, so she was using Steve Jabar's M&T Bank account to get the money overseas." Docket Item 426 at 78; *see* Gov't Exhibit 19E. But when Klimczak showed Bowers a copy of Jabar's bank account statement, she admitted that she had made the wire

transfer at Jabar's request, acknowledged that the money was used for Jabar's mortgage payments, and stated that the source of those payments was the UN grant. Docket Item 426 at 79-80; *see* Gov't Exhibit 21B at 9.

On Count 14, Jabar was convicted of telling the IRS and the FBI that the entire $350,000 from the UN grant—except for a small amount—was sent to Iraq for the radio station. *See* Docket Item 420 at 15. Klimczak testified that Jabar was not forthcoming on the various deposits into, and expenditures from, his personal bank account until he was confronted with financial records that traced the UN funds. For example, when discussing the $7,219 check, Jabar first said "that any funds that were payable to him from the UNIFEM grant funds was money that was used for the radio station." Docket Item 426 at 65. Klimczak testified that when he then showed Jabar a check for the same amount payable to the Tonawanda Town Clerk, Jabar "raised his voice" and said "sorry, big mistake, I'm going to get crucified for that." *Id.* at 66-67. Klimczak's testimony suggested that Jabar similarly became upset when confronted with other expenditures. *Id.* at 82. And according to Klimczak, when Jabar was told that approximately $60,000 was used for Jabar's personal expenses and loans, Jabar responded, "Even if I did, I didn't care." *Id.* at 82.

The defendants make several arguments with respect to their Section 1001 convictions, all of which lack merit.

Bowers and Jabar first argue that "any apparently false statements were, given the context, not intentionally deceptive." Docket Items 446 at 44, 433 at 42-43. But that is a question for the jury, and the government need only prove that the statements were false "under any reasonable interpretation." *United States v. Adler*, 623 F.2d 1287,

24

1289 (8th Cir. 1980); *see United States v. Diogo*, 320 F.2d 898, 907 (2d Cir. 1963)

(finding where no evidence is offered, "it is incumbent upon the [g]overnment to

negative any reasonable interpretation that would make the defendant's statement

factually correct").  Here, the jury could have reasonably interpreted the testimony and

corresponding exhibits to conclude that the defendants made materially false

statements to Agent Klimczak.  With respect to each count, Bowers or Jabar told

Klimczak that UN money was spent on the radio station when it was not.  And when

Klimczak confronted Bowers or Jabar with clear proof that the money was spent

otherwise, they admitted that what they had said earlier was not true.

> The fact that the defendants admitted their actual use of the funds when

confronted with compelling proof of where the money went does not erase or absolve

their prior false statements.  "[T]here is no safe harbor for recantation or correction of a

prior false statement that violates section 1001."  *United States v. Stewart*, 433 F.3d

273, 318 (2d Cir. 2006).  A court need not accept a defendant's innocent explanation of

her statements, and "absent fundamental ambiguity . . . the question of what a

defendant meant when he made his representation will normally be for the jury."  *Diogo*,

320 F.2d at 907.  Here, the jury had plenty of evidence from which they reasonably

could conclude that the defendants understood Agent Klimczak's questions but

knowingly chose to respond falsely before they were forced to admit the truth.[12]

---

[12] The defendants' use of $7,219 of the UN funds is perhaps the most salient
evidence that the defendants knew they were doing something wrong and wanted to
hide it.  *See* Gov't Exhibits 15G, 21B at 5, 20; 40G; 109A at 64 (Mar. 19 – Apr. 19, 2005
Statement), 112EJ.  Bowers wrote a check for $7,219, dated April 14, 2005, from the
Key Bank OKI account covered by the UN funds to Jabar.  The memo section of the
check reads "VOW Radio."  On that date, the check was deposited into Steve Jabar's
M&T bank account.  Later that day, Bowers wrote a check from Jabar's personal

Next, the defendants argue that without evidence of actual fraud, the defendants' statements with respect to expenditures of the grant money was not within the jurisdiction of the United States.  Docket Item 433 at 42-43; Docket Item 446 at 44.  The "primary purpose" of the statute's jurisdictional requirement "is to identify the factor that makes the false statement an appropriate subject for federal concern."  *Yermian*, 468 U.S. at 68.  "A department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation."  *United States v. Rodgers*, 466 U.S. 475, 479 (1984).  And "the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001."  *Id.* at 480.  Here, the IRS had the authority to investigate OKI's use of funds, and the defendants were obligated to cooperate with that investigation.  Docket Item 425 at 6, 27, 28, 38 ("[A]n IRS special agent . . . investigate[s] tax-related and other financial crimes in violation of federal law.").  Agent Klimczak's investigation did not fall outside the IRS's jurisdiction simply because the evidence produced at trial was insufficient to sustain convictions for wire fraud or wire fraud conspiracy.

The defendants also argue that the allegedly false statements were not material because any such statements could not have influenced Klimczak, who already knew the truth.  Docket Items 433 at 42-43, 446 at 44.  Not so.  "A false statement is material if it tends to or *is capable of influencing* the decision-making body to which it was addressed."  *Stewart*, 433 F.3d at 318 (citation omitted) (emphasis added).  Even

---

account for $7,219 to the Tonawanda Town Clerk.  Testimony revealed that the payment was for taxes on Jabar's properties.  *See* Docket Item 418 at 116-17, 131.  Writing "VOW Radio" on the check must have been intended to deceive—i.e., to make it look as though the check was used for something other than what it actually was used for.

though Agent Klimczak already knew where the grant money went—and therefore would not actually have relied on the defendants' false statements—such reliance is not required.  *See United States v. Lichenstein*, 610 F.2d 1272, 1277-78 (5th Cir. 1980). The test, rather, is whether the false statement had the capacity to influence.  *See Stewart*, 433 F.3d at 318.

Here, the false statements certainly had the capacity to influence.  Because Section 1001 is designed to protect the government "from the perversion which might result from the deceptive practices described," it would be counterintuitive for a federal agent's prior knowledge or diligence during an investigation to circumscribe the criminality of a false statement.  *See United States v. Rodgers*, 466 U.S. 475, 479-81 (1984).  Under the circumstances here, it was reasonable for the jury to conclude that the defendants' statements had the potential to influence the federal investigation as to UN grant money.

Finally, the defendants argue that the government violated their constitutional rights by soliciting, or not correcting, false testimony from Agent Klimczak.  Docket Item 434 at 7 (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  "[A] defendant's constitutional rights are violated when the government uses evidence that it 'knew, or should have known' was false."  *United States v. Vozzella*, 124 F.3d 389, 393 (2d Cir. 1997) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).  But Agent Klimczak did not falsely testify about the government's ability to conduct investigations abroad, and any equivocal testimony on that topic was clarified on re-cross and re-direct examinations.  *See* Docket Item 426.  Moreover, even if the government could have—or even should have—better clarified its ability to conduct investigations outside the United

States, that failure was not reasonably likely to have affected the verdict and therefore was harmless. *See Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) ("[A] conviction must be set aside if (1) the prosecution actually knew of . . . false testimony, and (2) there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").

## V.    Rule 33 Motion for a New Trial

Because this Court has found the evidence sufficient to sustain the defendants' convictions under Section 1001 (materially false statements), it turns to the defendants' Rule 33 motion for a new trial on those counts.[13]

As noted, this Court does not find persuasive arguments about the improper admission of evidence or the use of false testimony by the government. *See supra* Part IV. For that reason, the defendants are not entitled to a new trial on these grounds.

This Court finds equally unpersuasive the argument that there was prejudicial spillover from the fraud counts that warrants a new trial on the Section 1001 charges. The defendants argue that much of the evidence and testimony regarding misrepresentations relating to the dismissed wire fraud and wire fraud conspiracy charges did not apply to the specific false statement charges. Docket Item 433 at 64-65. According to the defendants, evidence of these misrepresentations constituted character assassination and general allegations of untruthfulness that would not have been admissible at a trial on the Section 1001 charges alone. *Id.* In particular, the

---

[13] Because the fraud and conspiracy counts have been dismissed, the defendants' motion for a new trial on those counts is moot.

defendants argue that Exhibit 30B—an email from Bowers listing the OKI board of directors—was a "tidal wave of prejudice, with no probative value." *Id.* at 65.

When a court dismisses some, but not all, counts on which a jury reached a guilty verdict, a new trial for the remaining counts is warranted if "it is impossible to separate the irrelevant from the relevant and the harmless from the prejudicial." *United States v. Lippi*, 190 F. Supp. 604, 607 (D. Del. 1961). In *Lippi*, the defendant was convicted of three counts under 29 U.S.C. Section 186, which makes it unlawful for any representative of any employee to receive or accept from the employer any money or thing of value. *Id.* at 605. The district court dismissed Count 2 because the indictment did not allege receipt of a "thing of value" and the government did not prove the defendant received money. *Id.* at 606. "Because the amount of evidence admitted to prove Count 2 was very substantial and [might] now be irrelevant and prejudicial[,]" the court granted a new trial for Counts 1 and 3. *Id.* at 607.

Unlike the counts in *Lippi*—which all were charges under the same statute—the counts of fraud (and fraud conspiracy) and the counts of false statements here do not share a close tie, let alone a statute. Although the government's unsuccessful effort to prove the fraud counts included evidence irrelevant to the false statements, that evidence is easily distinguished and not prejudicial. The Section 1001 counts on which the defendants were convicted were discrete and specific statements. Docket Item 1 at 17-21. Moreover, the jury acquitted Bowers on one count of making materially false statements, demonstrating that the jury considered each false statement charge individually, not holistically or in light of other misleading acts or statements. Docket Item 420 at 11.

For that reason, this Court disagrees that any evidence of uncharged but allegedly false statements, such as Exhibit 30B, caused the jury to convict the defendants on the false statement charges. And there is no real concern an innocent person was convicted here. *See Sanchez*, 969 F.2d at 1414. As discussed above in Part IV, there was clear evidence of each false statement—Klimczak's testimony of defendants' own statements—as well as compelling evidence that contradicted each statement that the defendants made.

For all those reasons, and because the convictions under Section 1001 do not otherwise constitute a "manifest injustice" warranting a new trial, the defendants' Rule 33 motions are denied.

## **CONCLUSION**

As is so often the case, the cover up here was worse than the acts that were covered up. The defendants knew they were doing something wrong by using the UN funds in the way that they did. Their use of the funds was not a crime—at least as charged here in light of the proof at trial. But in their efforts to deflect the federal investigation, they made materially false, and therefore criminal, statements.

For the reasons above, the defendants' Rule 29 motions are GRANTED with respect to Counts 1 and 4 (wire fraud conspiracy and wire fraud) but are DENIED with respect to Counts 11, 12, 13, and 14 (materially false statements). Docket Items 399, 433. The defendants' Rule 33 motions are DENIED. Docket Item 433. The Clerk of

Court is directed to enter a judgment of acquittal under Federal Rule of Criminal

Procedure 29 for Counts 1 and 4.

      SO ORDERED.

Dated:      September 27, 2017
                Buffalo, New York


                              _s/Lawrence J. Vilardo_
                              LAWRENCE J. VILARDO
                              UNITED STATES DISTRICT JUDGE